RAYWOOD CANAL & MILLING CO. v. SHARP et al. (No. 5447.)†

(Court of Civil Appeals of Texas. San Antonio. March 31, 1915. Rehearing Denied April 21, 1915.)

1. VENDOR AND PURCHASER ⬤➝334 — CONTRACTS — PERFORMANCE — RECOVERY OF PARTIAL PAYMENTS MADE.

Where a vendor, in a contract of sale stipulating for partial payments and a conveyance of good title at a future date subject to a vendor's lien, and for the return of the partial payments on the vendor being unable to make good title within a specified time, did not disclose to the purchaser that he had made a prior contract of sale to a third person, who had executed a deed of trust, the purchaser, on the vendor being unable to convey good title within the time fixed, could recover the money paid and a note executed for a partial payment, as

against the objection that the purchaser consented to the bringing by the vendor of a suit against the third person to determine his rights, and the purchaser could not be required to await the outcome of that suit to enable the vendor, if successful therein, to convey a good title.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 959–980; Dec. Dig. ⬤➝334; Contracts, Cent. Dig. § 1203.]

2. VENDOR AND PURCHASER ⬤➝340 — CONTRACTS—ENFORCEMENT—WAIVER.

Where a vendor knew, at the time a note given by the purchaser for a part of the price matured, that he could not execute a deed conveying good title, as stipulated for in the contract of sale, and he made no demand on the purchaser to pay the note, he waived nonpayment, and could not rely thereon to defeat an action by the purchaser for a partial payment made and for the note.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 1003–1007; Dec. Dig. ⬤➝340.]

3. VENDOR AND PURCHASER ⬤➝334 — CONTRACTS—ENFORCEMENT—WAIVER.

A vendor, contracting to convey real estate on the purchaser paying a specified sum subject to a vendor's lien for the balance, notified the purchaser of his inability to convey because of an outstanding contract in favor of a third person who had executed a deed of trust, and stated his unwillingness to continue the contract with the purchaser indefinitely, unless the purchaser made the payments stipulated for in the contract. Thereafter the vendor offered to close the deal without fixing any time when he thought he could make title, and the purchaser at that time stated that he did not have the money and could not take the land. The vendor was unable to convey a good title within the time fixed by the contract, and it might take a long time thereafter before he could perfect his title. Held, that the purchaser could recover the partial payment made and a note given for a partial payment.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 959–980; Dec. Dig. ⬤➝334; Contracts, Cent. Dig. § 1203.]

Appeal from District Court, Harris County; John A. Read, Judge.

Action by Alex A. Sharp against the Raywood Canal & Milling Company and another. From a judgment for plaintiff against defendant named, it appeals. Affirmed.

Robt. A. John, E. R. Spotts, and A. M. John, all of Houston, for appellant. Gill, Jones & Tyler, of Houston, for appellee.

MOURSUND, J. Appellee sued Raywood Canal & Milling Company and R. E. Brooks to recover $5,000, with 6 per cent. interest thereon from June 1, 1909, and for the cancellation of a $5,000 note given by appellee to said company, dated August 1, 1909, alleging that he had paid to the defendants said sum as earnest money under a contract to purchase certain lands, and had given the note in lieu of a further payment of earnest money; that defendants breached the contract under which the money was paid and the note given, in that they failed to furnish completed abstracts, and in that they failed to tender a good and marketable title as shown by the abstracts furnished,

⬤➝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
† Writ of error pending in Supreme Court.

and that defendants could not make title to the lands involved in accordance with the terms of said contract; that Sharp, when he found that defendants would not be able to tender a good and marketable title, and when he ascertained that said parties had failed and refused to comply with said contract with him, demanded the return of said $5,-000 paid by him and the cancellation of the note, but defendants refused to comply with such demand. Brooks answered, to the effect that the money was paid and note given to the Raywood Canal & Milling Company, and that he acted in the premises only as the agent of said company. Raywood Canal & Milling Company admitted that it entered into a contract with Sharp to sell him the lands mentioned in his petition, and alleged that it furnished abstracts to attorneys selected by him, which were retained and examined by such attorneys, and that upon said attorneys objecting to the title in certain particulars, said company promptly met and cured all objections except that created by an adverse claim of one Edwin D. Lowe; that said claim was baseless, but it was agreed upon the part of Sharp and his attorneys that said company should prosecute a suit against Lowe; that the nature of the suit so prosecuted by the company was acquiesced in by Sharp and his attorneys; that it was diligently prosecuted and the cloud cast upon the title by said claim of Lowe was removed; that Sharp expressly waived any objection to the title by reason of said claim of said Lowe and those claiming under him. Said company further alleged that while it was in all things performing its obligations under said contract, Sharp breached the same by failing to make a payment of $5,000, with interest, from August 1, 1909, at 6 per cent. per annum, due December 1, 1909; that prior to January 1, 1910, the date upon which, under a modification of the original contract, the company was to finally perfect and tender to Sharp good and merchantable title, but subsequent to the breach of the contract by Sharp in failing to pay the $5,000 on December 1, 1909, said company tendered to Sharp a good and merchantable title to said lands in every particular, or, if not a good and merchantable title in every particular, then such a title with the exception of the claim of Lowe and those claiming under him, which had been expressly waived by said Sharp, and that then and there Sharp declined to purchase the lands, and declined to pay the $5,000 due December 1, 1909 or the $40,000 due January 1, 1910, on the ground that he was unable financially to carry out his obligations under the contract. Defendant company alleged, further, that it had an agreement with Lowe whereby it could have secured the necessary instruments from him to clear the cloud cast upon the title by his purported claim, but that the suit against Lowe was at the request of Sharp and his counsel, and by reason of such fact Sharp was estopped to set up the company's failure to clear the title of the cloud of the Lowe claim by January 1, 1910. Two supplemental petitions were filed, as well as a supplemental answer, in which issue was joined upon the allegations relied upon by each party, but we conclude it will not be necessary to make any further statement of the pleadings than the foregoing. A verdict was returned, pursuant to instruction by the court, in favor of Brooks individually as against plaintiff's suit, and in favor of plaintiff against the company for $5,000 with interest thereon at 6 per cent. per annum from January 1, 1910, as well as for the cancellation of the note dated August 1, 1909. Judgment was rendered upon such verdict, and this appeal was perfected by the company.

### Summary of Evidence.

The contract entered into between appellant and Sharp reads as follows:

"Houston, Texas, April 26, 1909:

"Mr. Alex A. Sharp, City—Dear Sir: I will sell you the Raywood Canal & Milling Co. lands in Liberty and Chambers Counties, Texas, approximately 24,000 acres, and in addition thereto all the town lots belonging to the company in the town of Raywood, Texas, except such as have buildings, for a consideration of $325,000.00, payable as follows: $5,000.00 on June 1st, 1909: $5,000.00 on August 1st, 1909; and $40,-000.00 on January 1st, 1910. Upon payment of the total of $50,000.00 on January 1st, 1910, we will execute you a general warranty deed conveying said property, retaining a vendor's lien to secure the purchase money notes, which are to be divided into six notes, five for $50,-000.00 each, due in one, two, three, four and five years, respectively, from January 1st, 1910, and the sixth note for $25,000.00 due six years from date of said deed, all notes to bear 6 per cent. interest from January 1st, 1910, interest payable annually, and providing for 10 per cent. attorney's fees on usual terms and providing that failure to pay any note on installment of interest shall mature all notes at the option of the holder thereof. The deed shall contain provision that the vendor's lien retained thereon shall be released upon payment of $13.50 per acre each, or upon the payment of not less than $6.00 per acre and not less than $7.50 per acre in first lien notes on the land sold and also secured by deed of trust on the land so sold or upon delivery of like secured notes for $13.50 per acre. In the event release is obtained on notes only the notes given shall be all the notes received by you on the resale of the property.

"After January 1st, 1912, the releases to be secured by paying $11.50 per acre as above and after January 1st, 1913, upon payment of $7.50 per acre as above, providing all payments then due on said land have been met. In the event the release is obtained by delivering notes, the notes are to be held as collateral to your notes given us for purchase of said land. All notes of your vendees shall be for not longer than one, two and three years and bear 6 per cent. interest, payable annually, and secured by vendor's lien on the land sold.

"We agree to furnish you abstracts of title on said land without delay showing good and merchantable title to us in said property subject only to a lien in favor of H. P. Drought & Co., agents, for $139,000.00. It is agreed that we will meet and pay off this indebtedness as it matures, and to secure you that we will do so

we will deposit in the Union Bank & Trust Company, of Houston, Texas, your notes given us for the purchase price of said land an amount of notes equal to the amount we are due Drought & Co., agents, and if we should fail to meet said payments to Drought & Co., agents, as they mature and you should be forced to meet same, then you shall be entitled to demand and receive from said bank an amount of your notes equal to the amount you shall pay to said Drought & Co., agents. It is agreed that we shall secure the release of Drought & Co., as well as our own release of lands sold by you upon the terms above set out.

"If the titles to said properties are not good and cannot be made good within thirty days, then we will return you the $5,000.00 this day paid us as earnest money on said purchase, which is the amount recited in this contract and payable June 1st, 1910.

"This sale is subject to a contract we have with E. D. Lowe for the lease of 2,500 acres of said land for the year 1909, which lease money is to be paid to us.

"Witness our hands this 26th day of April, 1900.

"Raywood Canal & Milling Co.,
"By R. E. Brooks, Prest.
"Accepted: Alex A. Sharp."

At the, time the contract was executed Sharp paid to R. E. Brooks, for the company, the $5,000 earnest money. After the contract had been executed and delivered, defendant Brooks, who was president of the defendant company, informed Sharp of the fact that said company had, about two years before, entered into a contract to sell the same land to E. D. Lowe, and a deed from the company to Lowe, as well as his vendor's lien notes and the contract, was being held in escrow by Brooks; that the transaction had never been canceled, and Lowe was still trying to raise money to complete the trade. On June 1, 1909, Hogg, Gill & Jones wrote Brooks, acknowledging receipt of copy of contract between Sharp and the company, and stating:

"I note from the contract that no time is stated in which abstracts shall be examined, and I presume the proper construction is that if the titles are not good and cannot be made good within thirty days after report on the title, the $5,000.00 earnest money is to be returned. We will try to get report to you on this title by July 1, as per our conversation with you on last Friday."

Sharp employed Messrs. Hogg, Gill & Jones to examine the title to the land, and when the Lowe matter was first discussed between Brooks and F. C. Jones of the above-named firm, according to Brooks' testimony, they concluded that the contract with Lowe had terminated according to its terms, and no necessity existed for filing any suit to cure the defect caused by the existence of such contract. This discussion took place prior to June 30, 1909, and at the time Jones did not know that Lowe had organized a corporation known as the Raywood Company to which he had deeded the entire property, and that said corporation had executed deeds of trust upon the land to Mechanics' Trust Company of Boston to secure an issue of bonds payable to bearer. After these facts became known to Jones, and after Brooks

learned that a man named Molling was asserting that Lowe had some claim against the lands, another conference took place between Brooks and Jones in which Jones expressed the opinion that the best thing to be done in regard to the Lowe matter was to bring suit and clear it up. Brooks promised to do this. The character of suit to be brought was not discusssed. This conference must have occurred prior to June 30, 1909, for on that date Jones wrote Brooks, inclosing a copy of his opinion delivered to Sharp regarding the titles, in which opinion he calls attention to the existence of record of the deed of trust from the Raywood Company to the Mechanics' Trust Company, and informs Sharp of the entire situation with regard to the Lowe matter, of Molling's activity, of the fact that the matter had again been taken up with Judge Brooks, and that he had given assurance that he would file suit to clear up the matter. Numerous defects in the titles were pointed out in said opinion, and in the letter to Brooks Jones expressed the desire to discuss the opinion with Brooks or his attorneys at any time. On July 17, 1909, Hogg, Gill & Jones wrote appellant, describing the many instruments considered by them to be necessary to clear up the titles. On October 8, 1909, they wrote Brooks, returning a few of the abstracts, with request that they be brought down to date. On July 20, 1909, Brooks wrote Sharp as follows:

"I have received copy of opinion from your attorneys, Messrs. Hogg, Gill & Jones, upon the titles to the Raywood lands. I suppose you have also received copy of this opinion. It will be an easy matter to meet all the objections raised by them to the titles, but will take a little time, especially as to the Lowe matter upon which we expect to file suit to clear this up. However, it can all be done prior to January 1, 1910, the date when deed is to be executed.

"On August 1st, there will be due another payment by you of $5,000.00. Will you send us check for this amount or shall we make draft or how do you wish to handle it?

"I shall proceed at once to meet the objections raised by your attorneys."

The provision in the contract for payment of $5,000 by Sharp on August 1, 1909, was waived, and he gave his note which, it is admitted, was by mistake made payable December 1, 1910, instead of December 1, 1909. According to Brooks' testimony, this was done for the accommodation of Sharp. The provision in regard to making titles good in 30 days was also waived, and while no express agreement was made as to the time in which they were to be made good, it is evident that the parties expected them to be made good by December 1, 1909, and that the time when the deed was to be made, viz., January 1, 1910, was considered the ultimate time in which they were to be made good. Brooks, instead of suing to cancel the contract for nonperformance, on September 8, 1909, sued upon the vendor's lien notes and for foreclosure of the lien, thereby affirming the

contract, and electing to convey the land to Lowe under the contract, and therefore Lowe and his vendee had the right to redeem the land by paying the debt sued for. In the petition it was alleged that the consideration for the conveyance to Lowe was $750,000 of which $400,000 was paid, and the remainder was to consist of deferred payments. Lowe and his associates answered on September 22, 1909, and on October 28, 1909, filed an elaborate and formidable amended answer and cross-bill for damages in a large sum. The company obtained a judgment on March 8, 1910, for $251,064.46 and for foreclosure of its vendor's lien. The land was sold under this judgment, and was bought in by the company, and it still has an unsatisfied balance due on the judgment for about $200,-000. Sharp did not pay the $5,000 note on December 1, 1909, nor was any demand made upon him for the payment thereof. On December 6, 1909, appellant, acting by Brooks, wrote Hogg, Gill & Jones as follows:

"In reference to the sale to Dr. Alex A. Sharp of 24,000 acres of land in Liberty and Chambers counties, as per our contract of April 26th, '09, will say, that we have met all your objections to the title to this property, I believe, except the E. D. Lowe matter. We filed suit on the notes of Lowe to foreclose on this property and he has filed an answer setting up a counterclaim for a large amount. There is absolutely nothing whatever in his counterclaim but delay and it may take a long time however to reach the case and have it disposed of.

"We are willing to deed property and give warranty deed to Dr. Sharp and put him in actual possession of the property, and will obligate ourselves to bring the Lowe suit to trial as soon as possible, but we are not willing to continue the contract with Dr. Sharp indefinitely, unless he makes the payment he was to make on Jany. 1st, 1910, as we had expected to have this to meet payment due Drought & Co. on the land on that date. Unless we get this I fear Drought & Co. will foreclose on the land.

"As matters stand we will have to take some steps to protect the property now, hence will be forced to tender the title to Dr. Sharp in its present condition, which we now do formally and state that we are ready to close the sale up to him. If he is not willing to accept the title in its present condition then we will return him his $5,000.00 and cancel the contract.

"Please let me hear from you at once as to Dr. Sharp's wishes in the matter, as something has to be done at once to protect the property."

Hogg, Gill & Jones replied, on December 9, 1909, as follows:

"Yours of the 6th inst. received regarding the above. Replying, we beg to say that Messrs. Spotts & Mathews, since our last conference with them and you and with your Judge R. E. Brooks, have stated to us that they were working upon the title and would clear it up; but we have never had any further conference or any definite statement from them as to just what they have done. We believe that the title can be satisfactorily cleared up; but have rested upon their assurance and yours that it would be.

"We were aware of the Lowe suit being filed and believe that Dr. Sharp would be willing to take deed to the property (although we have not consulted with him, and are not authorized to speak for him in this respect), provided that you will clear up the defects that you have agreed to clear, and protect him against the Lowe suit by indemnity bond or otherwise. We are sending him your letter of December 6th, and will advise you promptly just as soon as we can hear from him."

Brooks' letter of December 6, 1909, was forwarded by Hogg, Gill & Jones to Sharp on December 9, 1909, addressed to Larned, Kan., which had been Sharp's address. The letter was received by Sharp at Topeka, Kan., on the 21st or 22d day of December, 1909, the delay having been caused by his absence from the state and his family's absence from his home in Kansas. He arrived in Houston on December 30, 1909. Brooks testified that he wrote the letter of December 9, 1909, because on December 16, 1909, there would be due on the land to Drought & Co. about $30,000, and appellant expected to get the money from Sharp to make the payment; that arrangements could have been made with Drought to wait until after January 1st; that, not hearing from Sharp, he raised the money to pay Drought, and in the meantime lost another buyer for the land, and on December 30th the situation had changed. On December 30, 1909, Sharp called upon Brooks, and a conversation took place, concerning which there was a conflict in the testimony of Brooks and that of Sharp and Rawson. Brooks testified:

"When Sharp came in to see me, after speaking to me he said: 'I suppose I will have to call that Raywood deal off.' I told him no; that I did not want to call it off; that I wanted him to go ahead and take the property; that I was ready to convey it."

He testified, further, that Sharp gave as a reason for wanting to call it off his financial inability to complete the deal, but that Sharp also seemed to think he had a right to call for the money back anyway, and not just because he did not have the money; that he (Brooks) informed Sharp that if he did call the trade off Brooks would not return the $5,000, and that he refused to tell Sharp the reason, but suggested that it was a matter better discussed with Sharp's attorneys. On January 10, 1910, Hogg, Gill & Jones wrote appellant demanding the return to Sharp of his $5,000 and his note, on the ground that appellant had failed to tender a good title on January 1, 1910, according to contract, and calling attention to the fact that said company had informed them that it was impossible for it to deliver a good title on January 1st. Brooks testified that after Lowe had filed his amended answer he had a conference with him, and it was agreed that the case should be set for December 13th, at which time Lowe should confess judgment or execute reconveyance; that later it became inconvenient for Lowe to be in Houston on December 13th, and he wanted Brooks to postpone the matter until January 14th, but Brooks told him that on January 1st he had to deliver title to Sharp, and he wanted the matter cleared up not later than the 1st day of January; that Lowe promised to be there on January 1st

and reconvey the property. Brooks testified that Lowe got to Houston in January, but he did not get to see him on January 1st. Brooks did not testify to any agreement by the Raywood company or the Mechanics' Trust Company to reconvey the lands to appellant.

### Opinion.

The question is whether the court erred in instructing a verdict for appellee.

[1] Appellant submits three abstract propositions, the first of which, when applied to the facts, may be said to amount to a contention that appellant was entitled to a reasonable time to clear up the conditions brought about by reason of the contract with Lowe, the execution of the deed by him to the Raywood Company, and the deed of trust given by said company. By reasonable time appellant means such time as was reasonably necessary to carry the suit brought by appellant against Lowe and others to a conclusion and if successful buy in the property under order of sale. This is not expressly stated in appellant's brief, but we think necessarily follows from what is said. The contention is so unreasonable in view of the evidence above set out, that it appears a waste of time to consider it. However, we will briefly discuss such contention.

Judge Brooks carefully refrained from mentioning the Lowe defect until he had secured a written contract with Sharp. He afterwards found that this defect was more serious than he thought it was, and got Sharp to waive the provision under which appellant was to cure all defects within 30 days. He understood that he was expected to get the title perfected by January 1, 1909, at the latest, as is shown by his letter to Sharp, as well as his testimony concerning what he told Lowe. The contract was not made with knowledge on the part of Sharp of the Lowe defect, and no agreement, express or implied, was ever made by Sharp to let the contract await the termination of the suit against Lowe and his vendees. But appellant says that Sharp, having been advised of the Lowe matter, and having proceeded, must give such time as was reasonably necessary to remove the objections created by the Lowe transactions. This amounts to the contention that Sharp, being assured that the titles would be perfected at the latest by January 1, 1910, and having accepted such assurance, is required by law to wait until the defects can be perfected by reasonable diligence, though such time may extend six months or even years beyond January 1, 1910. A statement of the proposition demonstrates its absurdity. It is said that Sharp and his attorneys, although not informed of the fact that appellant would elect to sue for foreclosure instead of cancellation of the Lowe contract, after the bringing of the suit acquiesced therein, and therefore should await the out-

come. It is not shown that Sharp ever knew what character of suit was brought. The evidence shows that Jones might have noticed in a newspaper devoted to court matters a statement of the nature of the suit. Jones had no authority to change the terms of the contract, and could not waive any of Sharp's rights, or bind him by acquiescence. But if Sharp had been informed of the nature of the suit, and had objected to it, what would have been the effect? His objection could not deprive Lowe and the other defendants of the rights acquired by appellant's election to affirm its contract with Lowe instead of to disaffirm it. The status of the rights of the parties was fixed when the suit was filed. Would Sharp's failure to make an unavailing and futile protest make him responsible for and a party to appellant's mistake? Certainly it would not. At the very utmost it can be said that Sharp acquiesced when appellant assumed that it would be satisfactory for it to perfect the title by January 1, 1910, and the evidence strongly indicates that it was the expectation of all parties that all defects would be removed by December 1, 1909. Such acquiescence would not change the contract from one to be performed on January 1, 1910, to one to be performed within a reasonable time, in view of the nature of the suit brought. It would be indeed a dangerous thing to extend the time to cure defects in a title if it had the effect of giving such time as was reasonably necessary to cure all defects, and to require in this case that Sharp should patiently await the outcome of a contested case in the hope that appellant would win and be able to transform its lien into a title through a foreclosure sale.

Appellant's other two propositions, when applied to the facts, amount to the contentions: (1) That Sharp cannot recover because of what he told Brooks on July 30, 1909; and (2) because he failed to pay the note due December 1, 1909. These contentions will be considered together.

Appellant may have had title to the lands when it made the contract with Sharp, but if it did, then by its voluntary act in electing to affirm the contract with Lowe it placed itself in the attitude of a lienholder, and gave Lowe the right to redeem by paying the debt sued for, and the Raywood Company, or any bondholder secured by the deed of trust to the Mechanics' Trust Company, had a like right. Appellant had brought upon itself a formidable answer and cross-action, and the case bid fair to require a long time for its ultimate decision. On December 1, 1909, appellant was in no position to require specific performance of the contract, nor was it on January 1, 1910, in such position. The contention that Brooks' testimony to the effect that Lowe promised to make him a reconveyance on January 1, 1910, affects the question is entirely without merit. Lowe's reconveyance would not have affected the

rights of the Raywood Company, nor those of the bondholders secured by the deed of trust, and there is no testimony that any one agreed to reconvey or release their rights. The evidence also shows that Lowe did not come to see Brooks on January 1st, and offer to reconvey, and in fact he never did reconvey. Brooks does not claim that he communicated with Lowe between December 30th and January 1st, so Lowe's failure to appear cannot be attributed to Sharp's statement on December 30th that he called the trade off. What Sharp said on December 30, 1909, in no way affected appellant's failure to get its titles perfected by January 1, 1910. His failure to pay the note on December 1, 1909, in no way affected the matter of appellant's failure to procure title to the lands by January 1, 1910. Appellant, through no fault of Sharp's, had no title to convey on January 1, 1910, and could not have enforced specific performance of the contract, and therefore cannot retain the earnest money and note on account of the note not having been paid December 1, 1909. Tharp v. Lee, 25 Tex. Civ. App. 439, 62 S. W. 93.

[2] Judge Brooks knew at the time the note matured that it was useless to exact payment of it unless Sharp would take a deed without waiting for the settlement of the Lowe matter, and therefore he did not demand payment thereof at any time, and failed to mention such note in his letter of December 6th. He waived the nonpayment of the note. At no time did he refuse to perform the contract on account of such nonpayment, nor did he testify that it had anything to do with his arbitrary demands of December 6th.

[3] But let us see what effect the letter of December 6, 1909, by Brooks to Hogg, Gill & Jones, has upon the rights of the parties. Appellant contends that, as it was not accepted promptly, it amounts only to an unaccepted offer, and should be eliminated from the case. While it is possible that Sharp's acceptance came too late, still the letter is not without its effect, especially when considered in connection with Brooks' testimony of what occurred between him and Sharp on December 30th. At the time this letter was written Brooks knew that his company could not make title on January 1, 1910, therefore he insists that Sharp must take a deed to land to which the grantor has no title, and pay $40,000, or else the deal is declared off by Brooks, but he is willing that Sharp shall receive his money back. What is the effect of this letter? Does it not simply mean that unless Sharp at once agrees to accept deed to the lands the entire deal is declared off by appellant? No other construction can be placed upon the letter. If Sharp had taken no steps after receipt of that letter, and after January 1st demanded his money, he would be entitled to it, because the letter called for no reply unless Sharp was willing to at once agree to accept deed to the lands. Appellant seeks to wipe out this letter, and have the conversation between Brooks and Sharp construed as if no such letter had brought it about. This cannot be done; Sharp's statement was based upon what had been said in the letter. He asked for his money, and appeared to think he was entitled to demand it. According to Judge Brooks' testimony, Sharp stated that he did not have the money, and it would be entirely out of the question for him to take the land, but seemed to be under the impression that he had the right to call off the trade, and Brooks testified, further, that he did not want to leave the impression that Sharp based that right upon the fact that he did not have the money. Brooks did not discuss with Sharp the matter of his right to call it off, but must have known that Sharp based it upon the statements made in the letter of December 6th. Knowing this, what did Brooks say? He stated that he was ready to close the deal, but would not return the purchase money. Ready in what way? He knew his company had no title and would have none on January 1st. Then in what way was he ready to close the deal? The answer is obvious. He was ready to close according to the terms of his letter of December 6th. Is there anything to show the contrary? He never said a word to Sharp or Sharp's attorneys about having any agreement with Lowe for a reconveyance. He said nothing to the effect that he expected to be able to make title on January 1st. He proposed no time when he thought he could make title. He did not say that his company was entitled to a reasonable time to carry its suit against Lowe through the courts in order to see whether it could reacquire title to the land. If he intended any other closing of the trade than that indicated in his letter, he failed to make his intention known to Sharp. We fail to see how appellant can base any rights upon the conversation between Judge Brooks and Sharp.

There were no issues to be determined by the jury, and the court was correct in instructing a verdict for appellee.

The judgment is affirmed.

