### SHAMROCK OIL & GAS CO. v. WILLIAMS et al.

### No. 4069.

Court of Civil Appeals of Texas. Amarillo.
Sept. 20, 1933.

Rehearing Denied Oct. 18, 1933.

Underwood, Johnson, Dooley & Huff, of Amarillo, for appellant.

Madden, Adkins, Pipkin & Keffer, of Amarillo, for appellees.

HALL, Chief Justice.

Otis L. Williams and the Kelly Petroleum Company, Inc., instituted this suit against the Shamrock Oil & Gas Company and the Amarillo National Bank to recover $4,000 which had been deposited in said bank by the Shamrock Oil & Gas Company to secure the performance of a contract entered into between the Shamrock Oil & Gas Company and the plaintiffs. The plaintiffs are named as parties of the first part and the Shamrock Oil & Gas Company is styled party of the second part. The contract, omitting the formal parts, is as follows:

"That, whereas, *parties of the first part are now the owners of an oil and gas mining lease upon and covering the following described land situated in Hutchinson County*, to-wit: The E. 1/2 of the northwest 1/4 of Sec. 30, Block Y, A. & B., and have agreed to sell to party of the second part, and party of the second part has agreed to buy from parties of the first part, an undivided one-half interest in and to said oil and gas mining lease on the above described tract of land, the terms and conditions of the sale being as follows, to-wit:

"1. The oil and gas mining lease above referred to is dated the 4th day of November, 1925, executed by E. B. Johnson and others as lessors, and running to All American Oil & Gas Co. as lessee, said lease being recorded in Vol. 30, page 348 of the deed records of Hutchinson County, Texas, and party of the second part has examined the original lease and is familiar with the contents thereof, and said original lease is here referred to and made a part of this agreement.

"2. The consideration paid and to be paid by party of the second part for the undivided one-half interest in and to said oil and gas mining lease is as follows: $10.00 cash in hand paid by party of the second part to parties of the first part, receipt of which is hereby acknowledged, and the drilling and completion of a well as hereinafter provided.

"3. Party of the second part shall, with-in sixty days from the date hereof, commence upon said land the actual spudding in of a well to be drilled for the procuring of oil and/or gas and once commenced said well is to be thereafter drilled with reasonable care and speed to sea level or to oil in paying quantities, and to be completed prior to the 4th day of November, 1930. It is expressly understood and agreed in this connection that the primary term of the lease on this tract terminates on November 4, 1930, and that *time is the essence of this agreement*, and that said well must at least be drilled into 'the big gas' before said date, and thereafter completed as herein provided.

"4. Party of the second part is to furnish all labor and materials at its own cost and expense for the drilling of said well, and hereby binds itself that upon completion of said well all material, equipment and other property shall be fully paid for, and party of the second part shall not have suffered any person, firm or corporation to in any manner incumber any of such property or to file mechanic's or materialmen's lien on account of any unpaid labor or material bills arising out of or in connection with the drilling of said well.

"5. It is understood and agreed that the well is to be drilled and completed 'to the tanks' in the time and manner above specified, and if oil or gas is encountered in paying quantities that it shall be the duty and obligation of the party of the second part to complete said well in such manner that the same is ready and capable of producing oil and/or gas without further cost or the necessity of furnishing further materials, except that parties of the first part shall pay one-half of the cost of the separator and tanks. And party of the second part is to complete said well, in the event the same produces oil in paying quantities, with at least a six inch oil casing and an eight inch casing and the surface pipe necessary to produce the oil in a first class manner. If the well is completed as a gas well, it shall be completed with the production string of casing and all necessary shut-off and surface strings of casing, and shall be fully equipped with the necessary gate valves and other equipment commonly and customarily used in the field in producing gas wells. The derricks and necessary equipment for the operation of said well shall remain on the lease and be the property of the parties hereto.

"6. Parties of the first part agree to execute an assignment to party of the second part conveying to it by good and merchantable title, a copy of which assignment is hereto attached. It is agreed by the parties hereto that a copy of this contract with the assignment is to be placed in escrow in the Amarillo National Bank, at Amarillo,

Texas, and held by said bank under the terms of this agreement, the assignment to be delivered by the bank to the party of the second part upon the completion of the well as herein provided. With said copy of said contract and the assignment, party of the second part is to place in escrow in said bank the sum of $4,000.00, which shall guarantee the performance of this agreement upon its part, and if party of the second part fails to spud in the well herein contemplated, within the time provided, this agreement shall become of no further binding force or effect upon them, except that the said bank shall pay to the parties of the first part the said sum of $4,000.00 as liquidated damages, actual damages being uncertain. It is further agreed and understood that in the event party of the second part otherwise defaults in the performance of this agreement or fails to complete the well in the time and manner hereinabove provided, the said assignment is to be returned by said bank to parties of the first part, and said bank shall also pay over to parties of the first part the said sum of $4,-000.00, and all hole, casing, derricks and oil well equipment, except drilling tools thereon situated at the time of the default shall then and there become the property of the parties of the first part as liquidated damages for the purchase of this agreement, the actual damages being uncertain.

"7. It is specifically understood and agreed between the parties hereto that the party of the second part does not by the execution of this agreement, nor by the furnishing of any of the material and the performance of any labor in the drilling of said well, acquire any interest in said leasehold estate until the completion of the well, and that this agreement does not and shall not create nor be construed to create a joint venture between the parties hereto until such time as the well has been completed, and all labor and material bills of every nature whatsoever paid, it being expressly agreed and understood that the consideration to be paid to parties of the first part by party of the second part, is the completion of said well as herein provided, clear of all liens and incumbrances of any nature whatsoever."

The controversy was submitted to the trial court on an agreed statement of facts, which disclosed that on or about May 5, 1930, plaintiffs Williams and the Petroleum Company entered into the foregoing contract. The petition alleged that the Shamrock Company had failed to drill the well within the time required and, in fact, had failed to drill at all, for which reason the sum of $4,000 which was placed in escrow as liquidated damages should be adjudged to them.

The Shamrock Company answered, alleging that the title placed in escrow by the plaintiffs did not convey good and merchantable title as required by the contract; that it was provided that time was of the essence of the contract, and immediately upon discovery of the defective title placed in escrow it treated the contract as terminated, because plaintiffs had first breached the contract for the sale of the mining lease in question by their failure to place in escrow a good and merchantable title, and prayed that the $4,000 earnest ·money theretofore placed in escrow be decreed to it.·

The Amarillo National Bank answered, alleging that it was a mere stakeholder in the transaction and held the $4,000 as such, and was ready and willing to pay the same to whoever the court decided was entitled to the fund. It prayed that it be allowed reasonable attorney's fees for filing the answer.

A trial to the court without a jury resulted in a decree that the Shamrock Oil & Gas Company had no interest in the fund held by the bank; that the plaintiffs were entitled to recover said sum, less $100 as a reasonable attorney's fee. It was further adjudged that plaintiffs recover as against the Shamrock Oil & Gas Company said $100 and that said Oil & Gas Company pay all costs.

By its first proposition the appellant insists that the trial court erred in rendering a judgment because the contract was executory and provided that time was of the essence of the contract and the vendor failed to plead and prove that a good and merchantable title was placed in escrow at the time and in the manner provided by the contract.

The case was prepared and tried under R. S., art. 2177. It is uniformly held that where there is an agreed statement of facts which is submitted to the court under art. 2177, that all issues with regard to the pleadings are immaterial. Scott v. Slaughter, 97 Tex. 244, 77 S. W. 949; Harde v. Germania Life Ins. Co. (Tex. Civ. App.) 153 S. W. 666; Thaison v. Sanchez, 13 Tex. Civ. App. 73, 35 S. W. 478.

The first proposition will therefore not be considered.

The substance of the statement of facts, in addition to what has heretofore been stated, is that· simultaneously with the execution and delivery of the contract hereinbefore set out in part, Williams and the Kelly Petroleum Company executed an assignment purporting to convey an undivided one-half interest in said oil and gas lease to the Shamrock Oil & Gas Company, and attached the assignment to the contract. The assignment recites, in part: "Whereas the said lease and all rights thereunder or incident thereto *are now owned by Kelly Petroleum Co., Inc. and Otis L. Williams.*

\* \* \* And for the consideration above recited, the undersigned, for themselves, their heirs, successors and assigns, *do covenant* with the said assignees, their heirs, successors and assigns, *that they are the lawful owners of said lease and all rights thereunder or in any way incident thereto;* that *they have good right and authority to sell and convey* the same and the said leasehold estate and *said rights in the property are free and clear from all liens and encumbrances* and *that all rentals and royalties due and payable under the terms of such lease have been duly paid* and the assignors herein warrant and promise to defend the title to said oil and gas lease."

It further appears from the statement of facts that shortly after the contract with its exhibits was deposited in escrow, Williams delivered to the attorneys of the Shamrock Oil & Gas Company an abstract showing the condition of the title of the land in controversy. At the time the contract and assignment were deposited in the bank, the Shamrock Company deposited the sum of $4,000 as provided in the contract, which is still on deposit in said bank, held in escrow by the bank. The Shamrock Oil & Gas Company's attorneys examined the abstract of title which had been submitted to them, and by written opinion dated May 13, 1930, made certain objections to the title, declaring them to be such defects as prevented the title from being good and merchantable, and declined to approve the title because it was not in their opinion in compliance with the contract, and on May 13th furnished Williams and the Kelly Petroleum Company a copy of their said opinion. On May 15th the Shamrock Oil & Gas Company wrote Williams and the Kelly Petroleum Company that they had read the opinion and declined to accept the assignment of the undivided one-half interest because, the lease "does not convey good and merchantable title to an undivided one-half interest in the leasehold estate in accordance with the contract and we consider the contract mentioned terminated." It also requested them to notify the Amarillo Bank to credit the account of the Shamrock Company with the $4,000 deposited in escrow. Williams and the Kelly Petroleum Company replied to this letter the next day, saying they were able and willing to meet each and every requirement as to title contained in the attorney's opinion and were anxious to do so. They charged that the Shamrock Company was adopting unfair methods to evade complying with its obligations, and asserted that they were ready to perform and would expect performance on the part of the Shamrock Company. The closing paragraph of the letter is: "If your letter of May 15th expressed your final determination in the matter and if it would be useless for us to proceed, will you kindly so advise us in order that we may govern ourselves accord-ingly." On May 23d the Shamrock Oil & Gas Company replied to the foregoing letter saying: "The statements contained in your letter to the effect that the Shamrock Oil & Gas Company was attempting to avoid or evade its obligations are not justified by the facts and we do not care to reply to any such statements except to say that the Shamrock Oil & Gas Company makes no effort to repudiate its contracts in any way whatsoever. In view of the short term of the lease in question, we would not care to enter into any new negotiations for acquiring this lease which would involve time for title corrections."

It will be observed that the contract does not stipulate that an abstract of title shall be furnished or that it shall be examined and objections, if any, pointed out, and the agreed statement does not show why the abstract was furnished. We must, therefore, assume that it was a voluntary act on the part of the plaintiffs in an effort to show that the title to the premises in question was good and merchantable, as required by the contract.

■ After inspecting the abstract and the opinion of counsel upon it, we are convinced that it did not show a good and merchantable title as required by the contract.

It is held that unpaid taxes constitute such an incumbrance as will prevent a title from being good and merchantable. Echols v. Miller (Tex. Civ. App.) 218 S. W. 48; Wright v. Bott (Tex. Civ. App.) 163 S. W. 360, Sec. [13].

The abstracts tendered did not show that all taxes had been paid, and did show notice of a tax lien under the internal revenue laws, filed by the collector of internal revenue against Montgomery, which notice had been recorded in Hutchinson county, where the land is situated. The abstract further showed that George E. Montgomery, in May, 1919, acquired by lease all the mineral rights to the land in question, in which other lands were also included. In April, 1920, he assigned to the All-American Oil & Gas Company, and as part of the consideration for the assignment, the assignee was to pay $3,200 either in oil or gas, produced from any well drilled upon the premises assigned. This lease has been held to be valid in Johnson et al. v. Montgomery et al. (Tex. Civ. App.) 31 S.W.(2d) 160. After the suit was filed the All-American Oil & Gas Company released their interest in the premises and received a new lease, but the fact remains that the $3,200, for the payment of which Montgomery as grantor has an equitable lien upon the premises, has never been paid. Whatever facts may be shown to defeat Montgomery's equitable lien, if any, do not appear in the abstract, and we are not passing upon the validity of his lien further than is shown by the abstract. It is our opin-

ion that the transaction upon the face of the record shows such a defect as would prevent the title from being declared good and merchantable. The All-American Oil & Gas Company assigned its lease to Harvey M. Radey in June, 1926, and Radey in turn soon thereafter conveyed the same to Thomas Kelly and Otis L. Williams, in the proportion of undivided three-fourths and undivided one-fourth interest, respectively. This assignment provides for the payment of $20,000 out of one-half of seven-eighths of the market value of all oil, gas, and casinghead produced from the premises, and from the recitation in the assignment it appears that the parties thereto recognized that a lien might be established against the leasehold estate, which could be deducted from the $20,000 payment. The lease, according to the abstract, now seems to be owned by Harvey M. Radey and Otis L. Williams in the proportion of eighteen-twentieths and two-twentieths undivided interest therein. It is not shown that the $20,000 or any part thereof has ever been paid, nor is it shown that any well has ever been drilled on the leased premises. It is not shown that any rentals necessary to preserve the lease have been paid. Moreover, the assignment from the Kelly Petroleum Company to the Shamrock Oil & Gas Company, which was also executed by Otis L. Williams, shows no authority upon the part of the party executing for the corporation to make the transfer, and we incline to the opinion that the certificate of acknowledgment is insufficient.

Without entering into a detailed discussion of the condition of the title, suffice it to say that it is not a good and merchantable title as that term is frequently defined. A good and merchantable title is said, in 5 Thompson on Real Property, § 4296, to be: "A title that is fairly deducible of record and not depending on matters resting in parol. The term 'marketable title' when applied to real estate, means a title free from reasonable doubt. An equitable title is not a marketable title. A title open to reasonable doubt is not a marketable title. The court can not make it such by passing upon an objection depending upon a disputed question of fact or a doubtful question of law in the absence of the party in whom the outstanding right was vested. He would not be bound by the adjudication and could raise the same question in a new proceeding. * * * It would especially be unjust to compel a purchaser to take a title the validity of which depends upon a question of fact where the facts presented upon the application might be changed on a new inquiry or are open to opposing influences. A reasonable doubt concerning the title exists when there is uncertainty as to some fact appearing in the course of its deduction and the doubt makes it such as affects the value of the property or will interfere with its sale. It is one in which the possession can be acquired and retained without litigation or judicial decision. It means a title that is reasonably free from such doubts as will affect the market value of the estate; one which a reasonably prudent person with knowledge of all the facts and their legal bearing, would be willing to accept. The title should not only be good, but indubitable. * * * A title may be perfect and yet not marketable. * * * The title may be good in fact but to be marketable it must of good record."

■ It is further said in Id. § 4296a: "Where the contract stipulates the character of title to be conveyed, effect will be given to such stipulation."

We think the Texas cases are in line with the rules announced in the text just quoted. Owens v. Jackson (Tex. Civ. App.) 35 S.W.(2d) 186; Alling v. Vander Stucken (Tex. Civ. App.) 194 S. W. 443; Adkins v. Gillespie (Tex. Civ. App.) 189 S. W. 275; Moser v. Tucker (Tex. Civ. App.) 195 S. W. 259; Bowles v. Umberson (Tex. Civ. App.) 101 S. W. 842; Collins v. Martin (Tex. Civ. App.) 6 S.W.(2d) 126; Veselka v. Forres (Tex. Civ. App.) 283 S. W. 303.

In Roos v. Thigpen (Tex. Civ. App.) 140 S. W. 1180, 1182, Rice, Justice, reviews the Texas cases which have considered the question of merchantable title, and says: "In Baldridge v. Cook, 27 Tex. 569, it is said that 'the distinctions between executed and executory contracts for the sale of land are recognized and clearly defined by this court in the case of Cooper v. Singleton [19 Tex. 260, 70 Am. Dec. 333], supra. The general rule enunciated in that case, that so long as the contract remains executory the purchaser shall not be compelled to pay the purchase money and take a defective title, has been uniformly sustained and followed in the subsequent decisions of the court (Hurt v. McReynolds, 20 Tex. 595), and other cases in manuscript not yet reported, and must now be regarded as settled law.'"

Judge Rice quotes with approval Maupin on Marketable Titles, c. 32, § 10, as follows: "Inasmuch as the law implies a contract that the purchaser shall receive a good title to the land, free from all defects, charges and incumbrances, it would seem unnecessary that the purchaser should insert in the contract any provision assuring him such title. Unless the facts clearly showed that the parties were contracting especially with reference to known defects of title, it would be difficult to perceive any ground upon which said decision can be rested, since no man in his senses would bargain for a shadow, when the substance is equally within his reach."

No verbal testimony was tendered at the trial. The contract, which includes the writ-

ten assignment, contains no ambiguous language. Time is made of the essence of the contract, not only in the express terms, but, as said in 5 Thompson on Real Property, § 4287d, "Time may be made of the essence of a contract to convey, either expressly or by implication arising from the nature of the property or the avowed objects of the vendor or purchaser. * * * The precise phraseology is not important. The intention of the parties as expressed by the agreement controls on this question."

■ Construing the contract as a whole, we have concluded that the mutual intent of the parties at the time of its execution was that the title to the property conveyed should be good and merchantable on that date. The plain, unequivocal language of section 6 is, that "the parties of the first part agree to execute an assignment to party of the second part, conveying to it by good and merchantable title, a copy of which assignment is hereto attached." It is not an agreement to convey property by a title which may at some time in the future, or before the completion of the well, be converted into a good and merchantable title.

There is abundant evidence showing that at the time the contract was executed both parties believed that the assignors had a good and merchantable title. The second paragraph of the contract is: "Whereas, parties of the first part are *now* [italics ours] the owners of an oil and gas mining lease upon and covering the following described land," etc. The assignment attached to the contract and made a part thereof (for which reason it must be considered with it) recites: "Whereas the said lease and all rights thereunder or incident thereto, are now owned by Kelly Petroleum Co., Inc. and Otis L. Williams." The warranty clause of the assignment recites that "they [lessors] are the lawful owners of the said lease and all rights thereunder or in any way incident thereto; that they have good right and authority to sell and convey the same and that said leasehold estate and said rights in the property are free and clear from all liens and encumbrances and that all rentals and royalties due and payable under the terms of such lease have been duly paid and the assignors herein warrant and promise to defend title to said oil and gas lease."

We must assume that the quoted representations and statements from the contract and the written assignment were sincerely and honestly made, and they certainly evidence an unqualified faith in the nature of the title which the lessors promised to convey. If they believed their title was good, and we must assume they did, then why should they intend to convey a title to be perfected by them in the future? That the assignees also believed that the title was good and merchantable is manifested by the fact that they deposited $4,000 in escrow at the time the contract was executed to guarantee performance upon their part of the obligations imposed upon them. If there had been any doubt as to the validity of the title, we think they would have required the insertion in the contract of the usual clause requiring the assignors to furnish an abstract of title within a limited time, and to correct any defects which their examining attorney might point out. The absence of this almost universal clause, together with their deposit of $4,000 in escrow, taken into consideration with the repeated statements in the written instruments of absolute ownership on the part of the grantors, is sufficient to satisfy us that the parties intended that the assignment should convey a title good and merchantable at the time it was executed.

■ We do not assent to the appellee's proposition that a stipulation in an executory contract that time is of the essence of the agreement is for the benefit of the vendor or grantor. The Texas courts construe it as being applicable to the vendee also. Hausler v. Harding-Gill Co. (Tex. Com. App.) 15 S.W.(2d) 548; Raywood C. & M. Co. v. Sharp (Tex. Civ. App.) 175 S. W. 499; Gaddis v. Mayfield (Tex. Civ. App.) 239 S. W. 1010; Nicholson v. Whyte (Tex. Civ. App.) 236 S. W. 770; Burks v. Neutzler (Tex. Com. App.) 2 S.W.(2d) 416.

■■ That it was intended that time should be of the essence of the contract is shown by the extremely short period in which the assignee was given to transport its derrick material and heavy machinery to the lease, to construct the derrick, spud in the well, and complete it to sea level or production. It is a matter of common knowledge that it requires much time to prepare for drilling an oil and gas well, and that at best it is a very expensive undertaking. Every contract must be given a reasonable construction. 10 Tex. Jur. 315. It is not reasonable to suppose that the appellant would perform the necessary labor and incur the enormous expense incident to the prosecution of the work within such a short time without the assurance that its title to the leasehold when the well was completed would be unassailable. Its right to rescind the contract under the circumstances presented by this record is amply supported by the authorities. The facts are undisputed. Believing that the learned trial judge erred in his construction and interpretation of the contract, the judgment is reversed and here rendered that Williams and the Kelly Petroleum Company take nothing, and that they pay all costs. It is further adjudged and decreed that the Shamrock Oil & Gas Company recover of the Amarillo National Bank the sum of $3,900. In so far as the judgment allows the Amarillo National Bank $100 as attorney's fees, it is affirmed. In all things else it is here reversed and rendered for the Shamrock Oil & Gas Company.